1

```
 1                   UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
 2     - - - - - - - - - - - - - - - X
                                     :
 3     INDIAN HARBOR INSURANCE        :   16-CV-04436(CBA)
       COMPANY,                       :
 4                                    :
              Plaintiff,              :
 5                                    :   United States Courthouse
                                      :   Brooklyn, New York
 6      -against-                     :
                                      :
 7                                    :   February 5, 2019
                                      :   2:00 p.m.
 8     KNOCKDOWN CONTRACTING,         :
       INC., ET AL.,                  :
 9                                    :
              Defendants.             :
10     - - - - - - - - - - - - - - - X
11            TRANSCRIPT OF CIVIL CAUSE FOR ORAL ARGUMENT
12              BEFORE THE HONORABLE CAROL B. AMON
                  UNITED STATES SENIOR DISTRICT JUDGE
13
                       A P P E A R A N C E S:
14
15    For the Plaintiff:   KAUFMAN DOLOWICH & VOLUCK, LLP
                             135 Crossways Park Drive
                             Suite 201
16                           Woodbury, New York 11797
17                      BY:  ERIC STERN, ESQ.
18
19    For the Defendant:   LAW OFFICES OF BAKER GREENSPAN & BERNSTEIN
       (Columbia Hicks       2099 Bellmore Avenue
       Associates, LLC)      Bellmore, New York 11710
20
                        BY:  EVAN RICHARDS, ESQ.
21
22    For the Defendant:   MALLILO & GROSSMAN
       (Andres Rivera)       163-09 Northern Boulevard
23                           Flushing, New York 11358
24                      BY:  JEFFREY M. BLUM, ESQ.
25
```

```
                         Proceedings                        2
```

1            A P P E A R A N C E S: (Continued.)

2   Court Reporter:    Denise Parisi, RPR, CRR
                       Official Court Reporter
3                      Telephone: (718) 613-2605
                       E-mail:  DeniseParisi72@gmail.com
4
    Proceedings recorded by computerized stenography.  Transcript
5   produced by Computer-aided Transcription.

6                      *    *    *    *    *

7

8            (In open court.)

9            THE CLERK:  16-CV-4436, Indian Harbor Insurance

10   Company against Knockdown Contracting, et al., on for oral

11   argument.

12            THE COURT:  Do the parties want to state their

13   appearances, please?

14            MR. STERN:  Yes, Your Honor.  Eric Stern from

15   Kaufman, Dolowich & Voluck for plaintiff Indian Harbor

16   Insurance Company.

17            MR. RICHARDS:  Evan Richards, Baker Greenspan &

18   Bernstein for codefendant Columbia Hicks.

19            MR. BLUM:  Jeffrey Blum, Mallilo & Grossman for

20   defendant Andres Rivera.  Good afternoon.

21            THE COURT:  Good afternoon.

22            All right.  These are cross-motions for summary

23   judgment.

24            Mr. Stern, I will hear from you first and let me ask

25   you -- you all can be seated.

Proceedings                                                    3

1          Let me ask you, are there any disputed issues of

2    material fact with regard to your motion or with regard to, in

3    your view, the cross-motion of Columbia Hicks?

4          MR. STERN:  Your Honor, I think the only fact that

5    appears throughout Columbia Hicks's motion that we dispute is

6    the role of MAJ Construction -- M-A-J Construction.  They say

7    in their papers that MAJ Construction was the general

8    contractor who had a contract with Knockdown.  That's not the

9    case.  MAJ is an entity that is also a named insured on the

10   policy along with Knockdown with the same address, with the

11   same principal.  We pointed out in our papers, as evidenced by

12   the documents, there is no reason to believe that they are

13   actually the general contractor when, in fact, they are alter

14   egos for one another.  But otherwise --

15         THE COURT:  Is that material to either motion?

16         MR. STERN:  I think so.

17         THE COURT:  Material to your motion?

18         MR. STERN:  It's material to Columbia Hicks's

19   motion, and in some ways to both, because one of the -- one of

20   the positions taken by Columbia Hicks is that Indian Harbor

21   failed to make proper efforts to find out information about

22   Knockdown, to contact Knockdown, and they said that one of

23   those failures is that we told our investigator to find MAJ

24   Construction Company, and they say MAJ is the general

25   contractor, so trying to find them at this address was

Proceedings                                                    4

1   necessarily going to be fruitless.  That's a mistake.  MAJ and

2   Knockdown are both entities that are the same exact address

3   run by the same exact person and are both named insureds on

4   the same policy.  So by saying to go find MAJ, it's in essence

5   saying go find Knockdown as well.  They are the same.

6          THE COURT:  So your position is MAJ and Knockdown

7   are the same person?

8          MR. STERN:  Are the same entity or alter egos for

9   each other.

10         MR. RICHARDS:  If I may, Your Honor?

11         THE COURT:  Yes.  I take it their position is that's

12  a disputed issue of fact with regard to -- well, you said it's

13  with respect to both motions.  If you say there's a material

14  issue of disputed fact, how do I grant your motion?

15         MR. STERN:  Well, I think that -- honestly, I think

16  that Columbia Hicks made an error in reading the contract is

17  what I think it is.  They state right in the contract's law

18  that the name of the general contractor is, like, Majestic and

19  they read that as being the same as MAJ.  They are not the

20  same thing.  I think that's what the issue is.

21         THE COURT:  But how is that -- you are moving for

22  summary judgment on behalf of Indian Harbor, correct?

23         MR. STERN:  That's correct.

24         THE COURT:  Is that a materially disputed fact with

25  regard to your motion?

Proceedings                                              5

1          MR. STERN:  No.  We think we made all the proper

2     efforts to find them, and by asking our investigator to find

3     MAJ, we were asking them to find the name mutual on the

4     policy.

5          MR. RICHARDS:  If I may respond to that, Your Honor?

6          THE COURT:  Do you believe that there are material

7     issues of disputed fact that preclude either Indian Harbor or

8     you, because you are also moving for summary judgment,

9     correct?

10         MR. RICHARDS:  I certainly don't think there's

11    anything that precludes me from winning on summary judgment.

12    As to Indian Harbor in their motion, I'll first address the

13    point on MAJ and Knockdown.  They are two separate entities,

14    separately incorporated, separate corporate IDs.  The fact

15    that they may or may not have the same address is really not

16    relevant.  I don't see that as a major issue of fact here.

17         One thing I do want to mention, though, is what I

18    believe plaintiff attempted to make into a material issue of

19    fact, which is not, is whether the Jairo Santiago who his own

20    investigator found in Brooklyn, located in Brooklyn, whether

21    that is the same Jairo Santiago.  Plaintiff's own investigator

22    concluded:  *We've been unsuccessful in locating Mr. Jairo*

23    *Santiago, and identified two Jairo Santiagos residing in the*

24    *New York area; however, we have ruled out both of them as*

25    *having any affiliations with MAJ Construction or Knockdown*

Proceedings                                                         6

1    *Contracting.*

2            And then at the eleventh hour, literally a week

3    before plaintiff submits his motion, he does a LexisNexis

4    address search which shows a Jairo Santiago residing at the

5    same building as the one the investigator found, different

6    apartment numbers.  And now this is plaintiff's last ditch

7    effort to say that the Jairo that the investigator found

8    actually is the correct one and not one that was ruled out by

9    his own investigator.  I attached a LexisNexis search of my

10   own to show the Court how unreliable it is and how it

11   shouldn't even be considered; it had addresses and e-mails for

12   me that I've never heard of.  So the only attempted issue of

13   fact that I would see was brought up by plaintiff, and whether

14   this Jairo is the correct one, but I think it's pretty clear

15   from plaintiff's own investigator's conclusions and from the

16   unreliability of the LexisNexis address search, which I don't

17   think this Court should even consider, that the Jairo that the

18   investigator found was the incorrect one.

19           THE COURT:  Had it been the correct one, would that

20   entitle Indian Harbor to summary judgment?

21           MR. RICHARDS:  No, it still wouldn't, because

22   there's still a three-part test from the *Thrasher* case from

23   the Court of Appeals that Indian Harbor has to meet.  Indian

24   Harbor has to meet all three of those parts of the test that

25   show that they acted diligently, to show that its efforts were

Proceedings                                              7

1   reasonably calculated, and to show that Knockdown engaged in

2   willful -- without obstruction.

3          THE COURT:  Why don't you let me just -- you can

4   respond to why that isn't the case, but let me give counsel an

5   opportunity to address why that is the case.

6          MR. STERN:  So thank you, Your Honor.

7          It is not disputed between the parties that there's

8   an underlying lawsuit in which Knockdown Construction Company

9   was sued by Andres Rivera -- sorry -- Knockdown is a second

10  third-party defendant in an action commenced by Andres Rivera.

11  It's a labor law case; Andres Rivera allegedly suffered

12  injuries.  Columbia Hicks, who is one of the defendants here,

13  was sued and brought a second third-party lawsuit against

14  Knockdown.  It's also not disputed between the parties that

15  Indian Harbor insures Knockdown Construction.

16         Indian Harbor appointed defense counsel to represent

17  Knockdown in this matter.  Many efforts were made to get

18  Knockdown's cooperation --

19         THE COURT:  Well, when did you first seek to get

20  Knockdown's cooperation?  Counsel argues it was, like, four

21  years into the lawsuit before you even attempted to find them.

22         MR. STERN:  Well, that's inaccurate.  First of all,

23  Knockdown wasn't named in the lawsuit until four years into

24  the lawsuit.  But as soon as Indian Harbor found out that

25  there was a claim, which was in 2009, the claims person who

```
                        Proceedings                        8
```

1   was working there at the time --

2        THE COURT:  That's the first time Indian Harbor

3   found out there was a --

4        MR. STERN:  There was something involving an

5   employee of Knockdown.

6        THE COURT:  First you find out about the lawsuit.

7        MR. STERN:  Right, the lawsuit.

8        THE COURT:  When was the lawsuit commenced?

9        MR. STERN:  The lawsuit was commenced --

10        MR. RICHARDS:  I have the date, Your Honor.  It's

11   February 19th of '09.

12        THE COURT:  Okay.

13        MR. STERN:  So when Indian Harbor found out about

14   it, they reached out actually to Knockdown's broker, which is

15   what they're supposed to do to find out --

16        THE COURT:  Who is Knockdown's broker?

17        MR. STERN:  It was CRC Insurance Company.

18        THE COURT:  When did you reach out to them?

19        MR. STERN:  That took place on -- that was an e-mail

20   from Trish Evans to Cynthia Davis at CRC on -- oh, April 2009.

21   April 11 -- it was an e-mail exchange from April 11, 2009 to

22   April 20th, 2009.

23        THE COURT:  So you asked CRC to tell you what?

24        MR. STERN:  CRC told us about the lawsuit, and then

25   we said how do we get in contact with Knockdown, and then I

Proceedings                                                    9

1    think at some point we were informed that Knockdown was out of

2    business.  But because there was no claims against Knockdown

3    at that time, there was no lawsuit naming them, there was

4    nothing more for Indian Harbor to do.

5              THE COURT:  It was a lawsuit naming you, right?

6              MR. STERN:  No.  Knockdown was not named in the

7    lawsuit as of yet.  There was an additional insurance claim

8    made by Columbia Hicks which required Indian Harbor's

9    attention, but we were able to litigate that without

10   Knockdown's involvement.

11             THE COURT:  When were you first brought in --

12             MR. STERN:  When was Indian Harbor first brought in,

13   or when was Knockdown first brought in?

14             THE COURT:  Well, both.

15             MR. STERN:  The declaratory judgment lawsuit

16   involving Columbia Hicks and Indian Harbor took place in 2012

17   and 2013.  If I recall, there was summary judgment or motion

18   to dismiss based on the absence for a contract and Indian

19   Harbor was able to defeat that lawsuit.

20             The second third-party lawsuit against -- the second

21   third-party lawsuit naming Knockdown came in on October 13th,

22   2012, when Columbia Hicks commenced a second third-party

23   lawsuit against Knockdown, so that was then three years later

24   when Knockdown first became a party to the lawsuit and the

25   first time that --

```
                    Proceedings                    10
```

1          THE COURT:  You insured Knockdown.  When did

2     Knockdown first become a party to the lawsuit?

3          MR. STERN:  In October of 2012.

4          THE COURT:  When did you first try and contact

5     Knockdown?  The first contact you tried to make through CRC,

6     correct?

7          MR. STERN:  Yes.  That was in 2009 when we first had

8     notice that there was a lawsuit and a loss that involved a

9     Knockdown employee.

10          THE COURT:  What lawsuit was that?

11          MR. STERN:  That was the lawsuit that Andres Rivera

12     commenced against Columbia Hicks.

13          THE COURT:  And you knew that Knockdown was involved

14     in that even though they weren't named.

15          MR. STERN:  That's correct.

16          THE COURT:  So as of 2009, you know you insure

17     Knockdown, and Knockdown has responsibility for that lawsuit

18     because it indemnified Columbia Hicks; you know that, right?

19          MR. STERN:  We don't know that, Your Honor.  There's

20     contractual issues that were litigated in the declaratory

21     judgment lawsuit, and that should be being litigated in the

22     underlying lawsuit, but because we don't have a witness, it

23     makes it difficult to litigate that.  But it is not correct to

24     say that we knew that Knockdown indemnified Columbia Hicks,

25     and it's not even clear that we should have known at the time

Proceedings                                               11

1   that Columbia Hicks would come chasing because there isn't a

2   good contract between them, so I wouldn't say that Indian

3   Harbor knew Knockdown would be involved.  I think there was a

4   lawsuit, we knew there was a mention of Knockdown, we tried to

5   reach out to them.

6              THE COURT:  When was that?

7              MR. STERN:  That was in 2009.

8              THE COURT:  2009?

9              MR. STERN:  2009.

10             THE COURT:  So you know there's a mention of

11  Knockdown -- so you are agreeing that, as of 2009, there's a

12  mention of Knockdown and you've got a responsibility to try

13  and find out where Knockdown is and get their cooperation as

14  of 2009.

15             MR. STERN:  We tried -- yeah, that's correct.  I

16  don't know about cooperation, Your Honor.  I don't want to

17  overstate what has to be done.  They are not named in a

18  lawsuit; there is no claim against them; there's nothing for

19  them to cooperate with, but we found out about a lawsuit that

20  involves their employee.  It's reasonable to try and get --

21             THE COURT:  When did they fail to cooperate with

22  you, and in what lawsuit did they fail to cooperate with you?

23             MR. STERN:  This second third-party lawsuit, when

24  that was filed in 2012, Indian Harbor appointed defense

25  counsel to represent their named insured, Knockdown, in that

Proceedings                                                12

1   matter; and defense counsel started making efforts at that

2   time to try and secure their cooperation.

3            THE COURT:  And what efforts did you make?

4            MR. STERN:  Well, the efforts were made through

5   defense counsel at that time.  Defense counsel's efforts

6   included multiple phone calls and letters to the last known

7   address to try and secure their cooperation.

8            You know, defense counsel could only produce so many

9   of their efforts because they are still currently representing

10  Knockdown in this underlying lawsuit, but according -- at

11  their deposition, they testified to 14 separate letters to

12  Knockdown regarding the underlying --

13           THE COURT:  Do you have any proof that Knockdown

14  ever received any of those communications?

15           MR. STERN:  No.

16           THE COURT:  Go ahead.

17           MR. STERN:  Upon defense counsel's failure to get

18  any kind of response from Knockdown --

19           THE COURT:  What do you rely on to establish the

20  third element; that after cooperation was sought, one was of

21  willful and avowed obstruction?  That's a very strong

22  requirement.

23           MR. STERN:  I agree, Your Honor.

24           THE COURT:  What do you have to prove that?

25           MR. STERN:  I agree.  It's two elements:  The first

Proceedings                                                          13

1    one, the one that can't be contested, is the fact that Indian

2    Harbor is now heavily prejudiced in trying to defend this

3    lawsuit; that there's been every effort made to try to contact

4    Knockdown to get their cooperation and there has been a

5    material prejudice.

6                THE COURT:  That doesn't talk about prejudice.  That

7    says:  *It's the attitude of the insured after cooperation was*

8    *sought was one of willful and avowed obstruction.*  I don't see

9    that as a prejudice prong.  I see that as a -- you've got to

10   show that they were willful and avowed in obstruction, and I

11   don't see here that you did much more than attempt to contact

12   them and got no response.  How does that constitute willful

13   and avowed obstruction?

14               MR. STERN:  Well, Your Honor, there is case law

15   where although they're -- most of the cases that find failure

16   to cooperate involve cases where the insured goes out and

17   says, I'm not going to cooperate anymore.  The insured's

18   inaction can be evidence of failure to cooperate and the Court

19   of Appeals in New York has held that.  They found that mere

20   inaction may be evidence of willful and avowed.

21               In addition, there's also the fact that once there

22   is -- once there is prejudice suffered by the insured in

23   trying to defend the insured, that can also be evidence of a

24   willful and avowed.

25               On top of that, Your Honor, is the fact that

Proceedings                                                                 14

1    although it was disputed that Jairo Santiago, who had a prior

2    address at the exact address where Knockdown was currently --

3              THE COURT:  What proof do you have that it's the

4    same person?  You are saying that if you contact -- what proof

5    do you have that it's the same person or that he even knew why

6    he was being asked these questions?

7              MR. STERN:  Well, obviously it's not the same

8    person.  He has no idea why he's being asked those questions.

9              THE COURT:  Someone has to tell him why they're

10   asking those questions.

11             MR. STERN:  There was a letter from the investigator

12   to Mr. Santiago, saying -- at that address, at the Brooklyn

13   address -- saying, you know, I'm coming to speak to you about

14   this Knockdown Construction, this case involving -- the case

15   involving the claimant here --

16             THE COURT:  That was to the Brooklyn address?

17             MR. STERN:  That was to the Brooklyn address.

18             THE COURT:  Where was he, this -- and then someone

19   talked to a person named Santiago?

20             MR. STERN:  Right.  And then the investigator went

21   to the address, the Brooklyn address you -- the new address

22   that he found for Jairo Santiago, found someone else who lived

23   there and said he's not here right now, here's a number where

24   you can reach him.  And then, according to the investigator,

25   he called that phone number -- or he left a note for him, that

Proceedings                                                    15

1   Mr. Santiago called the investigator, identified himself, and

2   when the investigator asked him about Knockdown, about MAJ,

3   about construction, he said he had no involvement in any of

4   these things and he wasn't the principal of Knockdown

5   Construction.

6               So if we take him at his word, then, you know, it's

7   not the guy, but according to Lexis, this person --

8               THE COURT:  But don't you have to establish this

9   willful and avowed?  Don't you have to, at the very least,

10  establish that he is the guy, or you don't get willful and

11  avowed?

12              MR. STERN:  I don't think I have to, Your Honor.

13              THE COURT:  What do you have to establish?

14              MR. STERN:  Your Honor, if Knockdown ever appears

15  and they are told in every single way they could be told --

16              THE COURT:  But you don't know that they got any of

17  that.  You can't prove they got any of that correspondence.

18              MR. STERN:  We sent correspondence to their agent

19  for service; we sent correspondence to their last known

20  address; we sent correspondence to their broker.  These are

21  all ways to let insureds know things.  At some point, you have

22  to assume that they receive things at addresses they give you.

23  You can't just say, well, we sent it and it arrived nowhere.

24  If they don't update their addresses, if they don't tell us

25  where they're going, if they don't update the Secretary of

Proceedings                                                      16

1    State about where they are, if they don't update their broker,

2    if they don't tell anybody, it can't possibly be the insurance

3    company's responsibility, especially when all the cases about

4    the diligent efforts, about diligent efforts in trying to get

5    their cooperation involve phone calls, letters from counsel,

6    phone calls to brokers, phone calls and letters to last known

7    addresses --

8              THE COURT:  Did any of the brokers tell you they

9    contacted the person and told them about this suit?

10             MR. STERN:  No.  They can't possibly find them.

11   Well, we did send it to their agent for service, that was

12   never updated --

13             THE COURT:  Someone gets default based on that, but

14   how is this -- back to my question.  How is it willful and

15   avowed obstruction?

16             MR. STERN:  Well, if they received these letters --

17             THE COURT:  Which you can't prove --

18             MR. STERN:  Other than the fact that they were sent

19   to their agent for service and the last known addresses,

20   and -- so we have to now assume in order to say that agent

21   didn't know anything, that the person who lived at the last

22   known address of Mr. Santiago, who lives at a new address for

23   Mr. Santiago --

24             THE COURT:  But how do you know it's a new -- the

25   fact that you are relying on a new address of Mr. Santiago,

Proceedings                                                    17

1    you are relying on this, just typing in his name in Google?

2              MR. STERN:  No, it's a Lexis search.  They search

3    the records, they find this person who -- at that former

4    address.  It's not just Google, it's a Lexis search.  It's --

5    they use all public records to compile these things.

6              THE COURT:  And they have different dates of birth?

7              MR. STERN:  Yeah.  They have different -- they have

8    different information on the Lexis search, you can get --

9              THE COURT:  No.  I mean the two Santiagos had

10   different dates of birth, didn't they?

11             MR. STERN:  No.  One had a last known address, which

12   was the address that had a new -- the address that we had as

13   his last known and one that did not.  So the guy who had the

14   last known address of the address that we had for him, I made

15   the leap as being the guy, but obviously we don't know that,

16   especially since he said, I'm not the guy.  So that makes it

17   difficult --

18             THE COURT:  So you don't have any proof that you

19   actually contacted "the guy" --

20             MR. STERN:  Well, no.

21             THE COURT:  -- to establish willful and avowed

22   obstruction.

23             MR. STERN:  Your Honor, I'm not aware of any

24   standard that says that you have to find the exact person and

25   the person has to then -- and you have to prove that he lied

Proceedings                                              18

1    to you to show willful and avowed obstruction.  We sent

2    letters to every possible contact we could find.  Any place we

3    could presume that they would get this, it went to them.  The

4    only company being protected by creating such an impossible

5    standard of finding a company that doesn't want to be found is

6    the company that disappeared on its obligations, which is

7    Knockdown.  It doesn't protect anybody to say well, you know,

8    if Knockdown doesn't -- if Knockdown changes its address and

9    doesn't tell anybody, or really just goes out of business and

10   no one takes their mail anymore and lies to anyone that comes

11   to the door, then --

12              THE COURT:  Who lied when you came to the door?

13              MR. STERN:  Mr. Santiago, the owner and principal of

14   Knockdown, assuming that that's the guy because he had the

15   same prior address.  But, Your Honor --

16              THE COURT:  But your own investigator says it's not

17   the same guy.

18              MR. STERN:  Well, do you know how he came to that

19   conclusion, Your Honor?

20              THE COURT:  I have no idea, but it's your

21   investigator.

22              MR. STERN:  I'll tell you how he came to that

23   conclusion:  Because, when he said are you the guy,

24   Mr. Santiago said no.  That's how he came to that conclusion.

25              THE COURT:  What proof do you have that that is not

Proceedings                                                    19

1    true and that's a lie and he is the guy?

2           MR. STERN:  Other than the prior address, I don't

3    have any.

4           THE COURT:  Is it enough?  Is it enough to show he's

5    the guy, because you are relying for willful and avowed

6    obstruction to prove that this is the guy -- the undisputed

7    that this is the guy and that he stonewalled him by saying I'm

8    not the guy.

9           MR. STERN:  Well, Your Honor, my proof of the

10   willful and avowed obstruction is the fact that Knockdown did

11   every single thing they could do to avoid ever being contacted

12   again.  They changed their address, didn't tell anybody; they

13   went out of business, didn't tell anybody.  They didn't even

14   tell the Secretary of State, didn't accept things from their

15   agent of service anymore, didn't contact their broker, so --

16   and if the guy --

17          THE COURT:  When did you first become aware of the

18   accident itself?

19          MR. STERN:  I believe it was the gentleman from

20   Columbia Hicks asking for additional insured coverage.

21          THE COURT:  That's the first time you have any idea

22   that someone you insured was being accused of --

23          MR. STERN:  It was the first time that we found out

24   that an employee of our insured was injured and they commenced

25   a lawsuit against Columbia Hicks.  The first time we found out

Proceedings                                          20

1  that our insured was being implicated in that lawsuit, that,

2  I'm not a hundred percent clear on.  I don't know when we

3  first found that out, but it was around the time we appointed

4  defense counsel, which is around the time of the filing of the

5  second third-party lawsuit.

6              THE COURT:  Thank you, Counsel.  Let me hear from

7  your adversary.

8              MR. RICHARDS:  Your Honor, there are so many

9  inaccuracies that I need to start by correcting, if I may.

10             If Indian Harbor is prejudiced, it's prejudiced

11 because it prejudiced itself.  In 2009, Indian Harbor should

12 have contacted Knockdown directly, not played a game of

13 telephone through a broker.

14             THE COURT:  Well, that's before they -- oh, okay.

15 That's when they know about the lawsuit.

16             MR. RICHARDS:  When they know about the accident,

17 when they know about the underlying lawsuit before they are a

18 party, but they still know -- I mean, everybody knows that the

19 employer is going to get added to this as a third-party at

20 some point, it's just the way labor law works.  Indian Harbor

21 should have contacted Knockdown at this point, contacted

22 Knockdown directly, not through a broker, not through a game

23 of telephone.  The duty is reciprocal.  Just like an insured

24 has a duty to contact the carrier when it knows of a lawsuit

25 or a possible lawsuit, the insurer has the same type of duty

Proceedings                                21

1  to contact the insured and notify them.

2          Contacting Knockdown at that point would accomplish

3  so many things.

4          THE COURT:  In 2009 you are saying?

5          MR. RICHARDS:  Correct.  It could have secured

6  cooperation; maintained contact information; whereabouts;

7  obtained relevant factual background information; you know,

8  secure witness' statements.  Witnesses disappear over time.

9  It could have accomplished so many things, but not -- but

10 Indian Harbor didn't actually contact Knockdown directly until

11 2013, and at this point, Knockdown was already dissolved for

12 more than a year.  So when you are sending letters and sending

13 letters and sending letters to a company who is dissolved for

14 more than a year, and you get them returned to you -- there

15 are envelopes from these letters showing that it's returned as

16 undeliverable, yet you keep sending letters and sending

17 letters to the same address, you are not going to expect a

18 different result.  Of course it's not going to get delivered.

19          Another error I want to correct is that the

20 investigator never actually told this one Jairo at -- in

21 Brooklyn, as to why he was contacting him.  He left a business

22 card --

23          THE COURT:  I thought there was a letter that was --

24 counsel said they sent him a letter at that same address.

25          MR. RICHARDS:  Left him a business card --

Proceedings                                22

1          THE COURT:  So no letter was sent to him at that

2     address?

3          MR. RICHARDS:  It's not in the record.  It's just a

4     business card to the landlord, and subsequently received a

5     call from a Mr. Jairo Santiago.  The witness indicated he's

6     never been in the construction industry and has no affiliation

7     with MAJ Construction.  He was a part-time truck driver and is

8     currently unemployed.

9          So those are a couple errors that I wanted to

10    correct on that.

11         THE COURT:  All right.  So there was no letter

12    sent -- according to you, there was no letter sent to Jairo

13    Santiago at the Brooklyn address.

14         MR. RICHARDS:  And even if it were, the Brooklyn

15    address in the investigator's report is a different apartment

16    number and a different date of birth --

17         THE COURT:  Different apartment number than what?

18         MR. RICHARDS:  Than what the Lexis search that

19    plaintiff's counsel provided as evidence that it's the correct

20    Jairo.  The Apartment No. 3 is in the investigator's report,

21    and I think Apartment No. 4B is on the Lexis search, and it's

22    got different dates of birth for this guy.  So it's impossible

23    to give this Lexis search any credibility or any weight in

24    considering anything because it's so unreliable as shown by

25    this and by the sample that I attached for the Court of my own

Proceedings                                                    23

1    Lexis search.

2              THE COURT:  A Lexis search of yourself?

3              MR. RICHARDS:  I submitted one to the Court to show

4    its unreliability.

5              THE COURT:  What was unreliable about it?

6              MR. RICHARDS:  It connected two addresses to me and

7    an e-mail address to me that I have never heard of, that I

8    never resided at, never had.  It had some of my old addresses

9    and my current one, but it also had addresses that must have

10   belonged to a different Evan Richards because they are not

11   mine.

12             Again, the Court should not even consider this Lexis

13   search as any type of evidence, and that's really the only

14   evidence that plaintiff's counsel has, if you can even call it

15   evidence, that the Jairo at this Brooklyn address is the

16   correct one, because the addresses match the Metropolitan

17   Avenue address of Knockdown Contracting where it conducted

18   business.

19             THE COURT:  Anything else?

20             MR. RICHARDS:  Yes, there are more things.  As long

21   as we are focussing on the willful and avowed obstruction, at

22   the absolute worst, at the absolute worst, they could show

23   nonaction, and that's assuming that some letter was received,

24   which there's no evidence that it was.  Letters were sent to

25   an address after the company is dissolved.  Of course they are

Proceedings                                                          24

1    not going to update it with the Secretary of State, they are

2    dissolved, more than a year dissolved.  Sending letters in

3    2013 and 2014 to a company and an address that dissolved in

4    January of 2012, obviously they are not going to get

5    delivered.

6              There's also a question of overall fairness which

7    *Thrasher* discusses, you know, because an innocent third-party

8    will suffer if an insurance company is able to disclaim

9    coverage.  My client, Columbia Hicks, we sold the property,

10   we're gone, and a month before the closing, the accident

11   occurs, so --

12             THE COURT:  That's good enough, though.

13             MR. RICHARDS:  Say again?

14             THE COURT:  That's good enough.

15             MR. RICHARDS:  In some instances it might be, but

16   that's only if Indian Harbor is able to disclaim coverage.  If

17   Indian Harbor disclaims, then Columbia Hicks gets left holding

18   the bag, and that's something that the *Thrasher* court

19   considered as something that a court should say -- will an

20   innocent third-party suffer -- in addition to the other three

21   elements, you know, the one that Your Honor focused on is --

22             THE COURT:  What was the status of the personal

23   injury action below?

24             MR. RICHARDS:  It's stayed pending this -- well, not

25   officially stayed, but everything keeps getting adjourned

Proceedings                                          25

1    pending the outcome of this.

2            THE COURT:  So there's been no trial or anything?

3            MR. RICHARDS:  No.  Well, it's scheduled for June,

4    but it keeps getting adjourned.

5            Another thing I want to mention is that Indian

6    Harbor --

7            THE COURT:  Knockdown is still being defended?

8            MR. STERN:  Yes, Your Honor.

9            MR. RICHARDS:  Yes.

10           THE COURT:  How badly was plaintiff injured?

11           MR. RICHARDS:  I think that's a great question for

12   Mr. Blum.

13           MR. BLUM:  Your Honor, he had multiple surgeries;

14   one to his right ankle, two to his left knee.  As I recall,

15   these surgeries are all arthroscopic surgeries, so I don't

16   want to puff up my case.  He also had multiple epidurals and

17   he never returned to work.  There is a workers' comp lien that

18   they've paid out approximately 350,000, for which

19   traditionally they were all -- reduce that by a third for

20   collecting it for them.

21           MR. RICHARDS:  There is another point that I want to

22   make to the Court about Indian Harbor prejudicing Knockdown.

23   They filed a late summary judgment motion, which the Court --

24   the lower court in New York denied; and then, on appeal, that

25   denial was affirmed and it was submitted more than 120 days

Proceedings                                    26

1   after the notice --

2           THE COURT:  Well, what is the relevance of any of

3   that?  They are not doing a good job representing Knockdown?

4           MR. RICHARDS:  The relevance of that is Indian

5   Harbor has now prejudiced Knockdown severely, and then after

6   prejudicing Knockdown so bad, now it wants to disclaim them.

7           THE COURT:  But how is that relevant to the motion,

8   the current motion, other than it doesn't -- it sounds like

9   they're not nice.  What relevance does it bear?

10          MR. RICHARDS:  Because it -- a factor that the Court

11  can consider is, if Indian Harbor has prejudiced its insured,

12  Knockdown, then that should be something that the Court

13  considers in determining whether or not to allow Indian Harbor

14  to disclaim coverage; because now you've prejudiced your

15  insured, yet you want to disclaim coverage.  You shouldn't be

16  allowed to do that given how badly Indian Harbor prejudiced

17  Knockdown by filing a late summary judgment motion.

18          THE COURT:  Where does that go in the analysis?

19          MR. RICHARDS:  It's on -- it's not from *Thrasher*,

20  but it's in the -- I believe point two of my motion.  Maybe

21  point three.  Yeah, point three of my motion.

22          Indian Harbor will claim that it submitted the

23  motion late because it couldn't get a witness to submit an

24  affidavit or to sit for a deposition, but the *Zuckerman* court,

25  which is a Court of Appeals case, said that you don't need

Proceedings                                          27

1    that, you don't need an affidavit from a witness:  *As long as*

2    *you have an affirmation of an attorney, even if he has no*

3    *personal knowledge of the facts, that may, of course, serve as*

4    *the vehicle for the submission of acceptable attachments which*

5    *do provide evidentiary proof in admissible form, documents,*

6    *transcripts.*

7               So defense counsel, Clausen Miller, they did submit

8    an affirmation with 14 attachments in their summary judgment

9    motion and it was denied as untimely.  Had it been submitted

10   timely, it might have been granted, we will never know.  But

11   because it was submitted untimely, Knockdown lost that

12   opportunity, Knockdown got prejudiced by Indian Harbor, its

13   carrier, and now Indian Harbor is trying to disclaim after it

14   has severely prejudiced its own insured.  And that would be

15   also significantly unfair and unjust.

16               THE COURT:  Okay, let me ask you a practical

17   question.  Has there been any discussion about resolving this

18   case -- I mean, what we would be resolving would be the

19   underlying case.  Has there been any discussion between the

20   two carriers --

21               MR. RICHARDS:  No, Your Honor.

22               THE COURT:  -- about that issue?

23               MR. RICHARDS:  No.

24               THE COURT:  Is that because you believe that can't

25   be discussed until this action is resolved?  Or is there some

Proceedings                                                28

1   way to agree on this ahead of time in terms of -- it would be

2   the plaintiff making a reasonable demand and the companies

3   deciding whether to split that up in some fashion?

4           MR. RICHARDS:  I don't think that's been discussed

5   at all.  I think we are waiting on Your Honor's ruling on

6   these motions.

7           THE COURT:  All right.  So you don't think it can be

8   resolved in the absence of this issue being resolved?

9           MR. RICHARDS:  I don't think so.  There hasn't been

10  any start-up conversation.

11          MR. STERN:  Your Honor, I don't -- I don't know.  It

12  would be defense counsel who handles that.  We, right now, are

13  just focused on this coverage element of it.  I don't know

14  what the status is of the demands from plaintiff that would be

15  considered reasonable.

16          MR. RICHARDS:  There is a demand from

17  plaintiff -- I'm not going to state it on the record in court

18  unless plaintiff's counsel allows me to.

19          MR. BLUM:  Of course.

20          MR. RICHARDS:  I believe it was 1.6.

21          MR. BLUM:  1.7.

22          MR. RICHARDS:  Pardon me.  1.7.  And with a demand

23  that high, there hasn't been -- there hasn't been a start to

24  any type of settlement discussion.  I think we are all waiting

25  on Your Honor's decision on the coverage issue before.

Proceedings                                                    29

1          THE COURT:  Okay.  Is there anything else either

2     side wants to address?

3          MR. STERN:  Your Honor, if I may speak to two things

4     that counsel represented that are -- he said that we said were

5     incorrect, and we just pointed out how we say they're correct

6     and he's incorrect.  He talks about the letter that the

7     investigator sent.  The investigator testified to sending the

8     letter to the Brooklyn address to Mr. Santiago.  He testified

9     to it on page 27 of his deposition.  It's exhibit -- I have it

10    here.

11         (Pause.)

12         MR. STERN:  Mr. Irwin's deposition is Exhibit 8 to

13    our motion on page 27A.  He speaks about sending the letter.

14    It wasn't a part of his production.  We wouldn't have it; he

15    is the one who would have it.  The fact that we don't have it,

16    I don't know what happened to it, but he testified to sending

17    that letter and that's why we made the representation here and

18    in our papers that the letter was sent based on --

19              THE COURT:  He's an investigator for whom?

20              MR. STERN:  He was the investigator hired by defense

21    counsel for Indian Harbor.

22              THE COURT:  Why don't you have the letter?

23              MR. STERN:  He sent it and didn't CC defense counsel

24    on it.

25              THE COURT:  Didn't he have a copy?

Proceedings                                30

1          MR. STERN:  He didn't produce it as part of his

2   records.

3          MR. RICHARDS:  There was no letter when we

4   subpoenaed his file.  He didn't have anything to give us.  It

5   was just his word that there was a letter sent, so we don't

6   have -- we've never seen an actual letter.

7          MR. STERN:  And the other thing is defense

8   counsel -- I'm sorry, counsel --

9          THE COURT:  Was the letter in English?

10         MR. STERN:  Was the letter in English?

11         THE COURT:  Yes.

12         MR. STERN:  I don't know.  I haven't seen the

13  letter.

14         THE COURT:  There's some testimony that Mr. Santiago

15  only speaks Spanish; is that right?

16         MR. STERN:  Did someone say that?  I don't know

17  that.

18         MR. RICHARDS:  I don't know that either.

19         THE COURT:  I may have misunderstood that.

20         MR. STERN:  Your Honor, the second point, Counsel

21  suggests that Indian Harbor just should have reached out to

22  Knockdown directly themselves.  Indian Harbor is an

23  excess/surplus lines insurer.  They don't have direct contact

24  with the insureds.  The proper way for them to go about doing

25  things is to reach out to the wholesale broker who then

Proceedings                                              31

1    reaches out to the retail broker, who then reaches out to the

2    insured.  There's never a situation where Indian Harbor would

3    just go and make a phone call to their main insured just like

4    this.

5            THE COURT:  I thought you sent a bunch of letters,

6    though.

7            MR. STERN:  Well, once defense counsel was

8    appointed, yes.  So, first it was the effort to go through the

9    brokers to get ahold of them, and we were informed by the

10   brokers they couldn't get in touch with Knockdown, and then

11   the letters were sent by defense counsel.

12           In terms of Indian Harbor's prejudicing of

13   Knockdown, you know, summary judgment was not granted against

14   Knockdown.  So, if Knockdown shows up tomorrow and is allowed

15   to testify, then maybe they could get a decent defense, but

16   it's very hard to say that Indian Harbor prejudiced them when

17   they have been nonresponsive.  And the only reason why the

18   answer wasn't stricken was -- when we got started with this

19   noncooperation, was because counsel in the underlying lawsuit

20   decided they want to get the answer stricken in the effort to

21   keep Knockdown involved in the case.

22           So these two elements that counsel says we

23   misrepresented, it's just not true, but for those reasons,

24   again, we request that summary judgment be granted for Indian

25   Harbor.

Proceedings                                    32

1        THE COURT:  Do you agree that if summary judgment is

2    denied you, it's granted Columbia Hicks, that there's nothing

3    that precludes the Court from granting Columbia Hicks summary

4    judgment?

5        MR. STERN:  I don't agree with that, Your Honor.  I

6    think that -- there's actually two elements that I think could

7    stand for a jury trial.  First is the reasonableness of Indian

8    Harbor's efforts.  That's certainly something that a jury or a

9    fact finder could determine.  If counsel says that Indian

10    Harbor was not reasonable in their efforts, they weren't

11    diligent in their efforts because they were only sending

12    letters to an address that was dissolved, if someone can show

13    what else Indian Harbor should have or could have done, that's

14    something I would like -- that a fact finder can certainly

15    determine.

16        By the same token, this issue about who this

17    Mr. Santiago was at the new address, which Your Honor seems to

18    have focused on for some of the questions, is also something a

19    fact finder could spend some time trying to determine.

20        MR. RICHARDS:  If I may, Your Honor, I don't think

21    it's a fact issue as to the reasonableness of Indian Harbor's

22    efforts to locate Knockdown.  There's an appellate division

23    case called *Imeri*, I-M-E-R-I, cited in my moving papers, that

24    outlines tests and elements that the insurer must go through

25    to show a reasonable calculation.  Some of those are a DMV

33

1  search, canvassing establishments in the area of the insured's

2  place of business, a post office inquiry, a prison index

3  inquiry, and researching the bank at which Knockdown deposited

4  its refund check.  Indian Harbor did none of those.  There's

5  nothing for a fact finder to determine.  This is a legal test;

6  it's not a factual test.  You've got five elements outlined in

7  a case and Indian Harbor did none of them.

8          And as to Counsel's assertion that a fact finder

9  could determine whether this was the correct Jairo Santiago, I

10 don't even think that this Lexis search would be admissible

11 evidence.  I certainly don't think the Court should give it

12 any weight, like I said before, in determining these motions.

13 To have a trial on whether this was the Jairo Santiago would

14 be quite a waste of judicial resources.  I think it's quite

15 clear it was not the correct one.  His own investigator said

16 it was not the right one, and now he does a Lexis search eight

17 days before he submits his motion papers with a different

18 apartment number, a different date of birth, and all of a

19 sudden that's supposed to create a factual issue?  I don't

20 think so.

21          THE COURT:  All right.  Thank you, gentlemen.

22          MR. RICHARDS:  Thank you.

23          MR. STERN:  Thank you, Your Honor.

24          MR. BLUM:  Thank you, Your Honor.

25          (Matter concluded.)